## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **PROJECT SOUTH**<br>9 Gammon Avenue<br>Atlanta, Georgia 30315,<br><br>**RINA HERNANDEZ**<br>20531 SW 123rd Ct.<br>Miami, Florida 33177<br><br>　　　　*Plaintiffs,*<br><br>v.<br><br>**UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT**,<br>500 12th Street, S.W.<br>Washington, D.C. 20536-5009,<br><br>**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES**,<br>20 Massachusetts Ave, N.W.<br>Washington, D.C. 20529<br><br>　　　　*Defendants.* | Civil Action No.: 1:19-cv-895<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## PRELIMINARY STATEMENT

1.   When he entered CoreCivic's for-profit Stewart Detention Center ("Stewart") for civil immigration detention on November 24, 2017, Yulio Castro-Garrido ("Yulio") was a healthy 33 year-old husband and father with no significant past medical history. When he left Stewart in an ambulance on January 7, 2018, Yulio was hypoxic, tachycardic, short of breath, and blue around his lips and nose.

2.   Yulio died of pneumonia on January 30, 2018, after nearly two weeks in a coma.

3.   This case is about the unlawful refusal of U.S. Immigration and Customs Enforcement ("ICE") to timely and fully release agency records about the 45 days Yulio spent locked up at Stewart in response to the Freedom of Information Act ("FOIA") request Plaintiffs filed on May 2, 2018.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over Plaintiffs' FOIA claims pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 552(a)(4)(B) (FOIA). Plaintiffs' request for declaratory and other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(F) and 28 U.S.C. §§ 1331, 2201(a), and 2202.

5. Venue is proper within this District under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1).

## PARTIES

6. Plaintiff **Project South** is a 501(c)(3) organization based on Atlanta, Georgia dedicated to the realization and defense of human rights and social justice.

7. Founded in 1986, Project South has developed thousands of leaders within communities directly affected by racism and economic injustice in order to build social movements and eliminate poverty.

8. Collection and dissemination of information to the public is a critical part of Project South's legal and advocacy work. Project South utilizes its unique experience and expertise to edit and analyze raw data and information and present it to a wide audience.[1] For instance, on May 4, 2017, Project South and partner organizations released a report entitled "Imprisoned Justice: Inside Two Georgia Immigration Detention Centers" documenting grave human rights violations at Stewart based on interviews with scores of detained immigrants, immigration attorneys, and advocates.[2]

---

[1] *See, e.g.,* Priyanka Bhatt, Priya Sreenivasan, Anthony Rivera, Daniel Yoon, Kevin Caron, & Azadeh Shahshahani, "Inside Atlanta's Immigrant Cages: A Report on the Conditions of the Atlanta City Detention Center" Project South (Aug. 2018) *available at* https://projectsouth.org/wp-content/uploads/2018/08/InsideATL_Imm_Cages_92_DIG.pdf. *See also* Mouhannad Atfeh, Julia Duperrault & Shari Wejsa, "A Dream Deferred: The devastating consequences of restricting undocumented student access to higher education in Georgia." Project South (2018) *available at* https://projectsouth.org/wp-content/uploads/2018/08/A-Dream-Deferred.pdf.

[2] *Available at* https://projectsouth.org/wp-content/uploads/2017/06/Imprisoned_Justice_Report-1.pdf.

9.   Obtaining timely, complete, and accurate information about ongoing government operations—and insight into apparent government wrongdoing—is critical to the effectiveness of Project South's public information and advocacy work.[3]

10.   Project South submitted the FOIA request at issue in this case on behalf of itself and Yulio's surviving spouse, Plaintiff Rina Hernandez.

11.   Plaintiff **Rina Hernandez** is the surviving spouse and next-of-kin of Yulio Castro-Garrido.

12.   Plaintiffs have constructively exhausted all non-futile administrative remedies.

13.   Defendant **U.S. Immigration and Customs Enforcement** ("ICE") is an executive agency component of the U.S. Department of Homeland Security and an "agency" within the meaning of 5 U.S.C. § 552(f)(1).

14.   Defendant **United States Citizenship and Immigration Services** ("USCIS") is an executive agency component of the U.S. Department of Homeland Security and an "agency" within the meaning of 5 U.S.C. § 552(f)(1).

## **FACTS**

**A.   ICE's Extensively Documented Epidemic of Medical Neglect at Stewart and Dangerously Low Staffing at the Stewart Detention Center.**

15.   Stewart is one of the largest and deadliest for-profit immigration prisons in the United States.

---

[3] *See, e.g.*, Azadeh Shahshahani & Priyanka Bhatt, "Atlanta Ended Its ICE Contract. But a Nearby Facility Quietly Started Jailing Immigrants," Rewire.News (Dec. 14, 2018) *available at* https://rewire.news/article/2018/12/14/atlanta-ended-ice-contract-nearby-georgia-started/; Azadeh Shahshahani, "Do immigrants in ICE detention centers have any human rights at all?" Salon.com (Apr. 24, 2018) *available at* https://www.salon.com/2018/04/24/do-immigrants-in-ice-detention-centers-have-any-human-rights-at-all/; Azadeh Shahshahani, "On this Human Rights Day: Act on the Cries of Detained Immigrants for Dignity and Justice," Jurist (Dec. 10, 2017) *available at* https://www.jurist.org/commentary/2017/12/Morgan-Peng-Shahshahani-human-rights-day/; Azadeh Shahshahani & Shoba Sivaprasad Wadhia, "The cruel but usual conditions inside two Georgia immigration detention centers," The Hill (May 18, 2017) *available at* https://thehill.com/blogs/pundits-blog/crime/334076-the-cruel-but-usual-conditions-inside-two-georgia-immigration; Azadeh Shahshahani & Anton Flores, "Immigrants in our detention centers still suffer human rights abuses," The Guardian.com (Dec. 14, 2015) *available at* https://www.theguardian.com/commentisfree/2015/dec/14/immigrants-in-our-detention-centers-still-suffer-human-rights-abuses.

16. According to the Department of Homeland Security's Office of Inspector General ("DHS-OIG")[4], independent monitoring and reports by civil society groups including Project South[5], and the admissions of ICE itself[6], chronic, dangerous understaffing at Stewart presented a "ticking bomb"[7] by the time ICE imprisoned Yulio there.

17. DHS-OIG investigators noted "some detaine[d immigrants] at . . . Stewart Detention Center reported long waits for the provision of medical care, including instances of detaine[d immigrants] with painful conditions, such as infected teeth and a knee injury, waiting days for medical interviewing."[8]

18. Captain James Blankenship, the ICE Public Health Service Administrator at Stewart, told DHS-OIG Investigators on February 8, 2017, that Stewart suffered from "chronic shortages of almost all medical staff positions."[9]

---

[4] U.S. Dep't of Homeland Security Office of Inspector General, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, OIG-18-32 (Dec. 11, 2017) (finding "long waits for the provision of medical care, including instances of detainees with painful conditions," unhygienic conditions, lack of sanitary supplies, and an "inconsistent and insufficiently documented grievance resolution process" at Stewart, as well as "language barriers [that] prevented detainees from understanding medical staff" general).

[5] Imprisoned Justice, *supra note* 2.

[6] Elly Yu, "Staff describe Georgia immigrant detention center as 'ticking bomb'" Reveal (Jun. 5, 2018) ("Federal records obtained . . . show the U.S. Department of Homeland Security's Office of Inspector General found widespread problems at Stewart Detention Center in southwest Georgia, including drug smuggling and staffing shortages that employees said endangered detention officers and detainees."). *Available at* https://www.revealnews.org/blog/staff-describe-georgia-immigrant-detention-center-as-ticking-bomb/.

[7] DHS-OIG FOIA Response 2018-IGFO-00059 at 16. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf

[8] U.S. Dep't of Homeland Security Office of Inspector General, *Concerns about ICE Detainee Treatment and Care at Detention Facilities*, OIG-18-32 (Dec. 11, 2017) (finding "long waits for the provision of medical care, including instances of detainees with painful conditions," unhygienic conditions, lack of sanitary supplies, and an "inconsistent and insufficiently documented grievance resolution process" at Stewart, as well as "language barriers [that] prevented detainees from understanding medical staff" general).

[9] DHS-OIG FOIA Response 2018-IGFO-00059 at 34-36. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf.

19. According to DHS-OIG's investigators' interview with an ICE supervisor at Stewart on February 8, 2017, "ICE ERO [was] severely understaffed in [the] Stewart facility. In addition, there is a problem with turnover among the officers."[10]

20. A CoreCivic Unit Manager at Stewart concurred with this assessment during his interview with DHS-OIG investigators: "Mr. [redacted] related that his biggest concern at SDC is staffing shortages which post a risk to the staff's safety."[11]

21. An ICE Mission Support Specialist and Contract Officer's Technical Representative concurred during her interview with DHS-OIG, stating "ICE ERO staffing is 'stretched thin' at Stewart and there is 'a revolving door' when it comes to attrition."[12]

22. CoreCivic's staffing levels were so low that detained immigrants at Stewart were forced to request medical attention at 4 o'clock in the morning or receive none at all: "Mr. [redacted] reports that the current sick call process will be changed once CoreCivic hires more officers. Currently detainees request sick call appointments at 4am, before breakfast. They are then scheduled for an appointment the same day. In the event of an emergency, CoreCivic employees will contact medical staff and medical staff take the detaine[d] immigrant to the medical area, or if necessary call an ambulance."[13]

23. Medical staff's reliance on CoreCivic to identify those in acute medical need was problematic, however, given that Capt. Blankenship reported to DHS-OIG "that one of the facility's biggest issues

---

[10] DHS-OIG FOIA Response 2018-IGFO-00059 at 17. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf
[11] DHS-OIG FOIA Response 2018-IGFO-00059 at 12. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf
[12] DHS-OIG FOIA Response 2018-IGFO-00059 at 21. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf
[13] DHS-OIG FOIA Response 2018-IGFO-00059 at 35. *Available at* https://www.wabe.org/wp-content/uploads/2018/05/2018-IGFO-00059_Final-Response_watermark-4.pdf

is under-communication. There are often significant time gaps before the medical office is notified of detainees breaking hunger strikes, fall incidents, and others."[14]

24. ICE itself acknowledged the grave dangers of combining chronic medical understaffing at Stewart long before Yulio got there.

25. In a Justification for Other Than Full and Open Competition signed by an ICE official on January 25, 2017, ICE noted that at Stewart "which houses an average population of 1,850 detaine[d immigrants], only 1 of 5 Public Health Service positions is currently occupied (20% fill rate). . . . ICE's failure to sustain minimum RN staffing levels will require healthcare services to be reduced . . . **endangering detainee and non-detainee safety**, disrupting detention operations . . . causing unnecessary evacuation of detaine[d immigrants] in order to bring the healthcare provider ration into compliance[.]" ICE warned "[**f]ailure to fill these services . . . will cause the sites to shut down, significantly curtail operations, or suspend acceptance of detaine[d immigrants] due to inadequate medical staffing.**" IHSC Maxim J&A for Berks and Stewart; Solicitation Number HSCDEM-15-C-00004 (Mar. 1, 2017) (emphasis added). **Exhibit A.**

26. More recently, DHS-OIG documented ICE's chronic failure to inspect, monitor, and effectively punish contractors like CoreCivic who serially violate the agency's detention standards.[15]

27. In two separate cases occurring within less than fourteen months, CoreCivic failed to conduct legally required visual checks of medically vulnerable detained immigrants in solitary confinement who took their own lives during the period in which CoreCivic guards failed to monitor them.[16]

---

[14] *Id.* at 36.
[15] U.S. Dep't of Homeland Security, Office of Inspector General, "ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements" OIG-18-67 (Jun. 26, 2018). *Available* at https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.
[16] Robin Urevich, Newly released documents reveal mounting chaos and abuse at a troubled ICE detention center," Fast Company (Jan. 29, 2019) *available at* https://www.fastcompany.com/90298739/newly-released-documents-reveal-mounting-chaos-and-abuse-at-a-troubled-ice-detention-center; Jeremy Redmon, "ICE detainee wasn't observed as required before he hanged himself," Atlanta Journal-Constitution (Oct. 4, 2017)

28. In each case, CoreCivic guards admitted to falsifying the observation logs to inaccurately reflect that they had performed the required checks.

29. The deadly failures of ICE, CoreCivic, and the Immigrant Health Service Corps and its medical contractors at Stewart have been the subject of extensive and widespread public interest.[17]

30. Notwithstanding these documented failures by ICE and CoreCivic, beginning in November 2018, ICE awarded CoreCivic additional responsibility and taxpayer money to take over the provision of medical care services at Stewart.

**B. Yulio's Widely Observed, Yet Untreated Medical Decline at Stewart.**

31. According to his Bureau of Prisons medical records and his immediate family, Yulio Castro-Garrido was a healthy 33 year-old husband and father when he entered Stewart in November 2017.[18]

32. However, according to interviews and sworn affidavits with several of his fellow detained immigrants, Yulio's health visibly declined in late December and into early January.

33. According to another Cuban immigrant interviewed by Project South who knew Yulio at both the D. Ray James Correctional Facility and Stewart, Yulio repeatedly sought medical treatment for his illness at Stewart, but received little or no response.

34. Specifically, in late December, Yulio told his lunch mates that he had a cold and had made a sick call because he was not feeling well while he was working in the kitchen.

---

*available at* https://www.ajc.com/news/state--regional-govt--politics/ice-detainee-wasn-observed-required-before-hanged-himself/6QWVp7xFVnEKSIc9MNJsKK/.

[17] *See, e.g.,* Rep. John Lewis (D-Ga) Letter to Ranking Members of House Judiciary and Homeland Security Committees (Jun. 6, 2018) *available at* https://johnlewis.house.gov/sites/johnlewis.house.gov/files/June%202018%20Rep.%20Lewis%20RM%20Letter%20about%20Immigration%20Rights.pdf; Letter from Sens. Warren, Wyden, Harris, Gillibrand, Blumenthal, Sanders, Booker, Markey, Hirono, Udall, and Merkley to CoreCivic Chief Executive Office Damon Hininger (Nov. 15, 2018) *available at* https://www.warren.senate.gov/imo/media/doc/2018-11-16%20Letter%20to%20Corecivic%20re%20Compliance%20with%20Immigration%20Detention%20Standards.pdf; Catherine E. Shoichet, "ICE Detention: Inside America's Hidden Border" CNN, *available at* https://www.cnn.com/interactive/2018/08/us/ice-detention-stewart-georgia/.

[18] Jeremy Redmon, "Brother: Cuban was healthy before dying of pneumonia in ICE custody," Atlanta Journal-Constitution (Feb. 20, 2018). *Available at* https://www.ajc.com/news/state--regional-govt--politics/brother-cuban-was-healthy-before-dying-pneumonia-ice-custody/9TNpiI95CYQPyiGPoSyzmJ/.

35. Yulio was reportedly prescribed cough medicine by a provider at Stewart.

36. By early January 2018, Yulio was still coughing, experiencing noticeable weight loss, and appeared visibly ill.

37. Yulio continued to inform other detained immigrants and authorities at Stewart that he did not feel well and felt weak.

38. His roommate and another detained immigrant eventually had to carry Yulio to sick call because he could barely walk.

39. Throughout this period, Yulio was working in the kitchen at Stewart under the observation of CoreCivic staff.

## C. ICE's Conflicting, Misleading Statements After Yulio's Death.

40. ICE notified the public of Yulio's death via press release on January 31, 2018. **Exhibit B.**

41. In its initial public notifiation, ICE falsely claimed Yulio "resisted treatment" after being diagnosed with pneumonia at Stewart.[19]

42. When Project South and Yulio's family challenged that narrative based in part on interviews with other detained immigrants, ICE subsequently – and without explanation – revised that statement, amending its release to say that Yulio, "didn't respond well to medically administered treatments, which caused his condition to worsen."[20]

## D. Defendants' Unlawful Withholdings in Response to Plaintiffs' FOIA Requests.

43. On May 1, 2018, Plaintiffs sent ICE a FOIA request seeking "all records in ICE's possession pertaining to Mr. Castro." **Exhibit C**. Plaintiffs' request included but was not limited to:

     a.   All records pertaining to the circumstances leading to Mr. Castro's death, including but not limited to any and all medical and mental health records, reports, notes, forms,

---

[19] ICE Press Release, "ICE Detainee Passes Away" (Jan. 31, 2018) (original) *available at* https://web.archive.org/web/20180201055738/https://www.ice.gov/news/releases/ice-detainee-passes-away.

[20] ICE Press Release, "ICE Detainee Passes Away" (Jan. 31, 2018) (amended) *available at* https://www.ice.gov/news/releases/ice-detainee-passes-away

complaints, incident reports, supplementary reports, witness statements, daily activity logs, incident detail reports, and video and audio recordings;

b.  All records pertaining to Mr. Castro's detention, including detainee location logs, kites, grievances, responses to kites and grievances, and medical and mental health screenings and assessments;

c.  All of the above records relating to Mr. Castro's incarceration at the D. Ray James contract facility, to the extent that such records have been made available to ICE;

d.  All records pertaining to any investigations of the circumstances surrounding Mr. Castro's arrest, detention, and/or death that are being conducted by ICE Office of Professional Responsibility, ICE Office of Detention Oversight, or any other U.S. Department of Homeland Security entity or other government entity;

e.  All records and communications between ICE and the healthcare facilities at which Mr. Castro was treated, including: the Southwest Regional Medical Center (SWRMC) in Cuthbert, Ga.; Phoebe Putney Memorial Hospital in Albany, GA; and the May Clinic in Jacksonville, FL. This request includes a request for all internal communications involving ICE Health Services Corps (ISHC) [sic] medical personnel, as well as any and all other records with other external healthcare providers for the purpose of acquiring treatment for Mr. Castro; and

f.  All documents or copies thereof that may have accompanied Mr. Castro when he was transferred from one facility to another, including without limitation:

  i.  (a) Any Form I-216 and/or appropriate copies of Form I-77, Baggage Check (or IGSA equivalent);

  ii.  (b) Any Form USM-553 or local Medical Transfer Summary form;

  iii.  (c) Any Form I-213, Record s/Deportable Alien Form;

  iv.  (d) Any original photocopy of Form I-203/203A, Order to Detain/Release Alien;

  v.  (e) Any Detainee Transfer Checklist;

  vi.  (f) Any age verification documents (if applicable);

  vii.  (g) Any copy or printout of all previous Post Order Custody Reviews (POCRs) and travel document requests in a property envelope fastened to the file;

  viii.  (h) Any classification sheet;

  ix.  (i) Any charging documents/records of proceedings;

  x.  (j) Any certified copies of convictions;

      xi.  (k) Any fingerprint cards;

      xii.  (l) Any photographs; and

     xiii.  (m) Any printouts from the Central Index System (CIS), ENFORCE and the FBI NCIC database.

44. Plaintiffs requested expedited processing of their request. **Exhibit C.**

45. On May 2, 2018, ICE acknowledged receipt of Plaintiffs' request and assigned it tracking number **2018-ICFO-33074**. **Exhibit D**.

46. In its May 2, 2018 acknowledgment letter, ICE determined that portions of the information Project South requested, namely, Yulio's Alien File ("A-File") falls under the purview of USCIS another DHS agency component. **Exhibit D**. ICE consequently referred that portion of Plaintiffs' request to USCIS.

47. On May 2, 2018, ICE denied Project South's request for expedited processing. **Exhibit E**.

48. On May 16, 2018, USCIS acknowledged receipt of ICE's referral for Yulio's A-File and assigned the request tracking number **NRC2018072037**. **Exhibit F**.

49. On May 16, 2018, USCIS denied Project South's request for expedited processing. **Id.**

50. On June 7, 2018, Project South timely appealed ICE's denial of expedited processing on June 7, 2018. **Exhibit G.**

51. On June 19, 2018, ICE acknowledged receipt of Project South's appeal and assigned it tracking number **2018-ICAP-00340**. **Id**.

52. On July 16, 2018, ICE denied Project South's appeal of its decision not to grant its request for expedited processing. **Exhibit H**.

53. On June 5, 2018, Plaintiffs appealed USCIS's denial of expedited processing. **Exhibit I** .

54. On June 21, 2018, USCIS affirmed its decision not to grant Plaintiffs' request for expedited processing. **Exhibit J.**

**E.  No End in Sight.**

55.  ICE claims on its online FOIA Case Status portal that the agency completes Complex Track requests like Plaintiffs' within an average of 111.59 days. **Exhibit K.**

56.  According to ICE's online case status tool, ICE added documents responsive to Plaintiffs' FOIA request to its review log and noted an estimated delivery date of June 18, 2018. **Id**.

57.  As of the date of this filing, 331 days have passed since ICE received Plaintiffs' FOIA request—nearly three times longer than the agency's average processing for a Track Two (complex) request, and roughly ten times longer than the thirty business days Congress contemplated in the FOIA's timing provisions.

58.  USCIS claims on its FOIA Case Status tool that it processes Complex Track requests for A-File material within an average of 104 business days. **Exhibit L**.

59.  As of the date of this filing, Plaintiffs' request stood at number 433 of 854 pending requests in Track Two. **Exhibit L.**

60.  This represents an advancement of only 15 places in the queue over 20 business days since Plaintiffs last checked the status of the request on March 1, 2019, when Plaintiffs were 448 out of 852. **Exhibit M**.

61.  At USCIS's current rate of processing, Plaintiffs would have to wait another 577 business days – 115 weeks, or over two more years – to receive records response to their request.

62.  In its FY20 Budget proposal, neither ICE nor USCIS requests a significant increase to the respective agencies' FOIA processing resources, despite both agencies' chronic, unlawful backlogs in processing complex track requests.

<u>CLAIMS FOR RELIEF</u>
COUNT ONE: VIOLATION OF THE FREEDOM OF INFORMATION ACT
5 U.S.C. § 552(a)(4)(B)
PLAINTIFFS V. ICE
2018-ICAP-00340
DENIAL OF EXPEDITED PROCESSING

63. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

64. Plaintiffs sought expedited processing of their request based on several factors demonstrating a compelling need as articulated in their original request to ICE and their subsequent administrative appeals. 5 U.S.C. § 552(a)(6)(E); 6 C.F.R. § 5.5(e)(3).

65. Plaintiffs have demonstrated a compelling need for the expedited processing of their FOIA request.

66. ICE's failure to grant Plaintiffs' request for expedited processing constitutes an unlawful withholding of agency records in violation of the FOIA.

67. Plaintiffs have exhausted all available administrative remedies.

**COUNT TWO: VIOLATION OF THE FREEDOM OF INFORMATION ACT**
**5 U.S.C. § 552(a)(4)(B)**
**PLAINTIFFS V. USCIS**
**APP2018000913**
**DENIAL OF EXPEDITED PROCESSING**

68. Plaintiffs sought expedited processing of their request based on several factors demonstrating a compelling need as articulated in their original request to ICE and their subsequent administrative appeal to USCIS. 5 U.S.C. § 552(a)(6)(E); 6 C.F.R. § 5.5(e)(3).

69. Plaintiffs have demonstrated a compelling need for the expedited processing of their FOIA request by USCIS.

70. USCIS's failure to grant Plaintiffs' request for expedited processing constitutes an unlawful withholding of agency records in violation of the FOIA.

71. Plaintiffs have exhausted all available administrative remedies.

**COUNT THREE: VIOLATION OF THE FREEDOM OF INFORMATION ACT**
**5 U.S.C. § 552(a)(4)(B)**
**Plaintiffs v. ICE**
**2018-ICFO-33074**
**Unlawful Withholding of Agency Records by ICE**

72. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

73. Plaintiffs have a legal right under FOIA to timely search and release of responsive, non-exempt agency records responsive to their May 2, 2018 FOIA request.

74. No legal basis exists for ICE's failure to adequately and timely search for and release responsive agency records in compliance with FOIA's time limits.

75. ICE's failure to make reasonable and timely efforts to search for and release responsive agency records constitutes an unlawful withholding under the Act that this Court can and should remedy through declaration and injunction.

76. Because ICE has failed to comply with the Act's time limits, Plaintiff has constructively exhausted his administrative remedies.

### COUNT FOUR: VIOLATION OF THE FREEDOM OF INFORMATION ACT
### 5 U.S.C. § 552(a)(4)(B)
### PLAINTIFFS V. USCIS
### NRC2018072037
### Unlawful Withholding of Agency Records by USCIS

77. Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs.

78. Plaintiffs have a legal right under the FOIA to timely search and release of responsive, non-exempt agency records responsive to their May 2, 2018 FOIA request.

79. No legal basis exists for USCIS's failure to adequately and timely search for and release responsive agency records in compliance with the FOIA's time limits.

80. USCIS's failure to make reasonable and timely efforts to search for and release responsive agency records constitutes an unlawful withholding under the Act that this Court can and should remedy through declaration and injunction.

81. Because USCIS has failed to comply with the Act's time limits, Plaintiffs have constructively exhausted their administrative remedies.

### REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.  Enter judgment in favor of Plaintiffs and against all Defendants.

2.   Order Defendants to process Plaintiffs' FOIA request expeditiously in accordance with 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e) by releasing all non-exempt portions of Yulio's A-File no later than fifteen (15) days after filing a responsive pleading in this matter and releasing all other non-A-File material within 30 (30) days after filing a responsive pleading in this matter.

3.   Declare Defendants' withholdings under the FOIA unlawful and enjoin these unlawful withholdings.

4.   Order Defendants to conduct a prompt and adequate search for all responsive records, determine which, if any portions of such records are exempt, and require Defendants to release the remaining portions of these agency records.

5.   Declare Defendants' serial violations of the FOIA's timing requirements, coupled with the agencies' serial failure to request significant budget increases from Congress, constitute a pattern and practice of FOIA violations, and refer each agency's FOIA office to the U.S. Office of Special Counsel in accordance with 5 U.S.C. § 552(a)(4)(F).

6.   Award Plaintiffs reasonable costs and attorney's fees pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d)(1)(A).

7.   Award Plaintiffs such further relief as the Court deems just, equitable, and appropriate.


Date: March 28, 2019                            Respectfully submitted,

                                                /s/ R. Andrew Free
                                                **R. ANDREW FREE, D.D.C. Bar No.: 59830**
                                                P.O. Box 90568
                                                Nashville, TN 37209
                                                Tel. 844-321-3221
                                                Fax: 615-829-8959
                                                Andrew@immigrantcivilrights.com

                                                *Counsel for the Plaintiff*